IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LAVAR DAVIS, | : | CIVIL ACTION |
| | : | NO. 12-5628 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| SOLID WASTE SERVICES, INC. | : | |
| d/b/a/ J.P. MASCARO & SONS, | : | |
| | : | |
| Defendant. | : | |

| | | |
|---|---|---|
| BENJAMIN GAY, | : | CIVIL ACTION |
| | : | NO. 12-5629 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| SOLID WASTE SERVICES, INC. | : | |
| d/b/a/ J.P. MASCARO & SONS, | : | |
| | : | |
| Defendant. | : | |

| | | |
|---|---|---|
| THOMAS BRUCE JOHNSON, | : | CIVIL ACTION |
| | : | NO. 12-5630 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| SOLID WASTE SERVICES, INC. | : | |
| d/b/a/ J.P. MASCARO & SONS, | : | |
| | : | |
| Defendant. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                    May 19, 2014

Plaintiffs LaVar Davis, Thomas Bruce Johnson, and Benjamin Gay (collectively, "Plaintiffs") each filed an employment discrimination action against Defendant Solid Waste Services, Inc. d/b/a J.P. Mascaro & Sons ("Defendant"), alleging disparate treatment on the basis of race, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e. Due to the common issues of law and fact posed by the three actions, the Court granted Plaintiffs' motion to consolidate the cases for pre-trial purposes. After conducting discovery, the parties filed cross motions for summary judgment. Defendant has also filed a motion to strike Plaintiffs' response to its motion for summary judgment. For the reasons that follow, the Court will grant the motion to strike in part, grant Defendant's motion for summary judgment in its entirety, and deny Plaintiffs' joint motion for summary judgment.

## I.   FACTUAL BACKGROUND

Defendant is a privately owned company that collects and disposes of solid waste from residential, commercial, industrial, and municipal customers, primarily in Pennsylvania. Def. Statement Undisputed Facts ¶ 2, ECF No. 49-1.[1] Plaintiffs

---

[1]    As discussed herein, see infra Section IV.A., the extent to which Plaintiffs dispute the facts laid out in Defendant's "Statement of Undisputed Facts" is unclear. Although Plaintiffs assert in their response to Defendant's statement

are African-American men employed by Defendant to drive garbage collection vehicles at Defendant's Souderton Division ("Souderton"). Id. ¶¶ 1, 14, 54, 90. Plaintiff Gay continues to work for Defendant to this day; Plaintiffs Davis and Johnson had their employment terminated in November 2011 and March 2012, respectively. Id. ¶¶ 18, 57, 91.

Plaintiffs allege that, during the course of their employment, they regularly experienced race-based disparate treatment, primarily at the hands of Dmytro "Sonny" Macelak, the General Manager of Souderton at the time.[2] Id. ¶ 8. They say that African-American drivers at Souderton were assigned to drive unsafe trucks, were compensated at lower rates, were subjected to derogatory and profane comments, and were singled out for disciplinary actions and burdensome work assignments. Cumulatively, those alleged actions amount to a hostile work

that they dispute many of the facts it contains, Plaintiffs fail to support those assertions with citations to the record. Indeed, there are only two citations to the record in the entirety of Plaintiffs' response, and those references cite generally to the deposition of Benjamin Gay, a 176-page document. Therefore, the Court has treated the facts in Defendant's statement as undisputed except where it has identified contradictory evidence in the record. See Fed. R. Civ. P. 56(e) (permitting a court to "consider [a] fact undisputed" when a party "fails to properly address another party's assertion of fact").

[2]     Macelak's employment was terminated on February 28, 2013, due to an unlawful discharge of a leachant into the environment at the Souderton facility. Pl. Statement Undisputed Facts ¶ 32, ECF No. 50-2.

environment, Plaintiffs contend. Plaintiffs Davis and Johnson further contend that the termination of their employment was the product of race-based animus. As for Plaintiff Gay, he says that he was "constructively discharged" due to race discrimination, and that he was unlawfully suspended without pay on at least one occasion.

Defendant tells a wholly different tale, asserting that all of its trucks were safe to drive, that black and white employees were treated equally with regard to work assignments and disciplinary practices, that Macelak directed his profane language at people of all races, and that Plaintiffs Davis and Johnson were fired for legitimate, nondiscriminatory reasons – Davis for habitual tardiness, and Johnson for intentional abuse of company equipment. Defendant argues that there is simply no evidence of the disparate treatment Plaintiffs describe, nor is there evidence that any of the adverse actions they identify were motivated – in whole or in part – by racial discrimination.

Accordingly, as this case turns on whether there is record evidence supporting Plaintiffs' factual assertions, it is necessary to recite in some detail the specific evidence relevant to Plaintiffs' claims. The Court notes at the outset, however, that Plaintiffs have made that task difficult by neglecting to cite to the record in numerous places and, when they choose to cite to it at all, by citing to lengthy documents

without including a page number – for example "Appendix, Vol.
I." See, e.g., Pl. Resp. ¶ 8, ECF No. 53. As discussed in more
depth herein, those failures violate Federal Rule of Civil
Procedure 56(c). Nonetheless, Plaintiffs do cite with
specificity to some materials, and the Court has undertaken its
own review of other materials in the record, which it may
(although it need not) consider in its analysis.[3] Fed. R. Civ. P.
56(c)(3) ("The court need consider only the cited materials, but
it may consider other materials in the record.").

A. Unsafe Trucks

In their deposition testimonies, Plaintiffs identify four
garbage trucks that they consider to be dangerous to operate.
Gay Dep. 81:17-23, Sept. 6, 2013, ECF No. 53-3; Johnson Dep.
16:1-6, Apr. 16, 2013, ECF No. 49-3; Davis Dep. 191:23-24, Apr.
15, 2013, ECF No. 49-2. Three of those trucks are "front-end
trucks," designated as "FE-99," "FE-104," and "FE-116."[4] The
fourth allegedly hazardous truck is a "container truck" labeled
"CT-15." All of those trucks were quite old at the time

---

[3]     For the reasons discussed herein, the Court does not
consider the six "declarations" Plaintiffs attach to their
response to Defendant's motion for summary judgment, as those
declarations are neither sworn to nor subscribed to by the
declarants.

[4]     Davis also identifies another front-end truck as
dangerous – FE-101 – but he does not describe how that truck was
hazardous, he drove it a total of only nine times, and the truck
was rarely (if ever) used after March 2011.

Plaintiffs operated them, with the model years of the front-end trucks ranging from 1994 to 1997. Def. Mot. Summ. J., Ex. 31, Souderton Front-End Fleet, ECF No. 49-13. Three of the vehicles – FE-99, FE-104, and CT-15 – were spare trucks that were used only when other trucks were not available. Def. Statement Undisputed Facts ¶¶ 146, 148; see also Def. Mot. Summ. J., Ex. 30, Truck Usage Log, ECF No. 49-13. Plaintiffs describe numerous problems with each of the four vehicles, ranging from lack of air conditioning, to holes in the floorboard, to fire hazards.[5] In response, Defendant has introduced deposition testimony from Souderton staff describing the procedures Defendant had in place to ensure its trucks were safe, as well as evidence of the significant maintenance work performed on the vehicles during the relevant time period. Def. Statement Undisputed Facts ¶¶ 136-141, 162.

Both parties have also introduced evidence regarding the frequency with which Plaintiffs operated those allegedly dangerous vehicles. Plaintiff Gay testified that he rarely or never drove trucks FE-99 and FE-116, that he drove FE-104 "[m]aybe three times," and that he refused to drive CT-15 after driving it on three occasions. Gay Dep. 86:5-7, 87:24-88:3, 89:19-20, 94:22-95:17. Similarly, Plaintiff Davis said in his

---

[5]      FE-99 was in fact destroyed in a vehicle fire on July 22, 2011. Pl. Statement Undisputed Facts ¶ 36.

deposition that he refused to drive CT-15 and FE-99, and
Souderton records show that he drove FE-99 a total of twenty-one
times during the last year of his employment, and that he drove
FE-116 just five times. Davis Dep. 180:4-8; Truck Usage Log.
There is no evidence that Davis ever drove FE-104. As for
Plaintiff Johnson, he testified that he operated CT-15, but it
is unclear with what frequency, and the records show that during
the last fifteen months of his employment he drove FE-99 only
three times and FE-104 twice. Johnson Dep. 14:22-23; Truck Usage
Log.

In sum, the evidence shows that Plaintiffs drove the
spare trucks (FE-99, FE-104, and CT-15) occasionally, at best.
As for the remaining truck – FE-116 – Plaintiffs Gay and Davis
rarely, if ever, drove that vehicle. Plaintiff Johnson, on the
other hand, regularly drove FE-116 for a period of time. From
June 2011 through his termination in March 2012, FE-116 seems to
have been Johnson's primary vehicle, as he drove it 111 times
during that period. Truck Usage Log.

Defendant has also introduced evidence of the trucks that
other drivers, both black and white, drove while employed at
Souderton. That evidence shows that all four allegedly dangerous
trucks were driven by people of both races. First Macelak Dep.
223:18-224:21, July 23, 2013, ECF No. 49-5; Second Macelak Dep.
54:7-12, Sept. 10, 2013, ECF No. 49-6; Truck Usage Log; Def.

Statement Undisputed Facts ¶¶ 150-152, 157. Although Plaintiff
Gay testified to the contrary during his deposition, claiming
that he did not see white drivers driving the four allegedly
dangerous trucks, that claim is undermined by his admission that
he generally left on his route before other drivers arrived and
finished before they returned. Gay Dep. 67:17-20, 113:4-14:24.
Even FE-116, which was primarily driven by Johnson during the
relevant period, was regularly driven by white drivers before
Johnson took over. Truck Usage Log; Def. Statement Undisputed
Facts ¶ 151. As Plaintiffs themselves note, in 2011, FE-116 was
assigned to black drivers (including Johnson) 86 times, and to
white drivers 69 times. Pl. Statement Undisputed Facts ¶ 48, ECF
No. 50-2. Moreover, the evidence shows that the other trash-
collection vehicles were distributed between black and white
drivers, with several black drivers driving some of the newest
trucks. Def. Statement Undisputed Facts ¶¶ 153-156.

B. <u>Rates of Compensation</u>

Plaintiffs also challenge "Defendant's wage payment
practices," although it is unclear precisely which aspect of
those practices they say is discriminatory. <u>See</u> Pl. Resp. ¶ 17.
The record evidence regarding those practices is as follows:
Macelak testified at his deposition that drivers of front-end
trucks are paid a flat "day rate" plus a per-can "lift rate" for
each garbage can that the driver services. Def. Statement

Undisputed Facts ¶ 169. Rates of compensation are based on driver tenure, performance, and cost of living adjustments. <u>Id.</u> Defendant submitted its employee compensation information for 2011, which shows no race-based disparities in compensation. <u>Id.</u> ¶¶ 171-173.

Macelak further testified that drivers are not permitted to work more than sixty hours each week, pursuant to Department of Transportation regulations. First Macelak Dep. 64:12-24. Sometimes drivers went over that amount – for instance, if a truck broke down and other drivers were needed to help that driver out, the drivers providing assistance may exceed their hour limit. <u>Id.</u> at 65:4-24. If that happened, drivers recorded their excess hours in a log that was reported to the Department of Transportation. <u>Id.</u> at 66:1-67:15. Plaintiffs assert that black drivers were more frequently asked to assist other drivers in finishing their routes, which resulted in violations of the sixty-hour requirement. Beyond that bare contention, however, there is no evidence supporting that claim. Rather, the dispatcher for Souderton – who all parties agree was responsible for arranging driver assistance – testified that drivers of both races needed and provided assistance with their routes on occasion. Def. Statement Undisputed Facts ¶¶ 165-68.

C. Unfair Disciplinary Actions and Work Assignments

In addition to their assertions regarding the driver assistance program, Plaintiffs say that black drivers were singled out for discipline and for burdensome work assignments. The only evidence of that disproportionate treatment is Plaintiff Gay's deposition testimony, in which he stated that (1) three white employees had truck accidents that caused substantial damage, yet he did not think their employment had been terminated (Gay Dep. 108:16-110:9); (2) one white employee often failed to attend monthly required "safety meetings," but was allowed to make them up later, a courtesy he did not think was extended to black employees (id. at 160:17-161:11); (3) he was subjected to more rigorous evaluations of his vehicle inspections than other employees (id. at 166:9-167:16);[6] and (4) black employees were sometimes asked to clean the "blades" (a part of the truck) of other truck drivers (id. at 165:19-24). Gay admitted, however, that he had not seen the personnel files for other employees (id. at 110:15-111:10), and that any

---

[6]     Defendant has a program called the "yellow tag program" that is designed to ensure that drivers adequately inspect the condition of their vehicles prior to use. Each night, the maintenance manager would place a handful of yellow tags on various items that should be checked as part of a pre-trip truck inspection. Drivers were expected to find all the flags; if they did not, they were subject to discipline for failing to conduct a proper inspection. Gay claims that he often had six tags placed on his truck, whereas other employees generally received only two tags.

instances in which he was asked to clean other drivers' blades were "so long ago, [he] can't remember who or where" (id. at 165:23-24). He also asserted that he alone was subjected to rigorous evaluations of his vehicle inspections, not that black employees in general were treated differently in that regard. See id. at 166:9-167:16.

In response, Defendant has introduced the disciplinary records of many of the white drivers. Those records show that, like Gay (and other black drivers), white drivers received disciplinary warnings for truck accidents, failing to properly inspect their vehicles, safety violations, unexcused absences, poor customer service, and the like. Def. Mot. Summ. J., Ex. 35, Disciplinary Records, ECF No. 49-18. The records also show that, of the three employees Gay identified as not being properly disciplined for their accidents, one was in fact terminated and another was suspended. Id.

D. Derogatory and Profane Comments

One of Plaintiffs' primary assertions is that Sonny Macelak, the General Manager of Souderton, was verbally abusive toward the black drivers. Gay testified that Macelak frequently used profanity when talking to him and would make derogatory comments to him, such as telling him "You walk around here like you have a stick up your ass," and calling him a "dumb motherfucker." Gay Dep. 113:8-9, 132:22. Although Plaintiffs

concede that Macelak used profane language with both black and white employees (see Pl. Mem. Supp. Mot. Summ. J. 4, ECF No. 50-1), Gay testified that, overall, the derogatory comments seemed more often to be directed at black employees. As an example, he explained that Macelak would often berate the drivers during monthly "safety meetings," and when doing so he seemed to be looking at the black employees, who generally would be standing together in a group. Gay Dep. 138:5-20. Gay indicated that such targeted verbal abuse happened at least "three or four times." Id. at 138:24.

In addition to the general profanity and derogatory comments attributed to Macelak, Plaintiffs also identify two instances in which Macelak made statements that could be viewed as racist in nature.[7] First, Gay testified that he once walked by the employee lounge and overheard a voice that sounded like Macelak's describing President Obama using a racial slur.[8] Id. at

---

[7]     Plaintiffs identify two other incidents in their Statement of Undisputed Facts – a comment to Macelak allegedly made to Davis about his white, female companion, and an incident in which Macelak ignored Johnson and instead invited a white employee into his office. Pl. Statement Undisputed Facts ¶¶ 20-21. As evidence of those facts, however, Plaintiffs point only to the Complaint (which is not evidence), and to the "Deposition of Thomas B. Johnson" generally. The Court could not locate an account of either incident in the sections of Johnson's deposition testimony included in the record.

[8]     Macelak disputes that accusation, testifying that he would never say that and that he actually voted for President Obama. Second Macelak Dep. 90:10-18.

165:6-14. Second, Plaintiffs point to an internal memo Macelak wrote that included a note regarding an incident in which Macelack discussed certain mechanical issues during a staff meeting. The note concluded: "Ben Gay was at attendance and we all know they talk," implying that Gay perhaps told another employee (Plaintiff Johnson) about those issues. Def. Mot. Summ. J., Ex. 20, Macelack Memo, ECF No. 49-11. Plaintiffs contend that the word "they" in Macelak's statement refers to the black drivers.

E. Davis Termination

Plaintiff Davis's employment was terminated in November 2011, after Davis had worked for Defendant for six years. Def. Statement Undisputed Facts ¶¶ 13, 18. The official reason given for Davis's termination was excessive tardiness/absence. Id. ¶ 18. Defendant's attendance records reflect that Davis was tardy thirty-two times in 2010, and that he had five unexcused absences. Id. ¶ 30. In 2011, his record worsened; he was late more than one hundred times, and he had seven unexcused absences. Id. ¶ 31. As a result, he received numerous disciplinary reports, and he was twice suspended due to tardiness problems. Id. ¶¶ 33-41, 46. Following his second tardiness-related suspension, he did not report to work for three days and then was late for the rest of the week, which

prompted the termination of his employment. Def. Mot. Summ. J., Ex. 16, Davis Disciplinary Reports, ECF No. 49-11.

There is no record evidence disputing that account of Davis's termination. Davis acknowledged in his deposition that he knew about Defendant's tardiness policies, he admitted that he had been late many times, and he did not contest the accuracy of the attendance records. Davis Dep. 16:14-28:21. In their briefing to the Court, Plaintiffs suggest that Davis's tardiness was due to "down time" for vehicle repairs, which was outside of his control, but there is no evidence of that in the record. See Pl. Resp. ¶ 19.

F. Johnson Termination

Plaintiff Johnson's employment was terminated on March 12, 2012, after Johnson had worked for Defendant for almost a year. Def. Statement Undisputed Facts ¶¶ 54-57, 87; Def. Mot. Summ. J., Ex. 19, Johnson Disciplinary Reports, ECF No. 49-11. The reason given for Johnson's termination was intentional abuse of company equipment. Johnson Dep. 14:11-14. Specifically, Defendant explained to Johnson that he was fired because he operated FE-104 all day on March 8, 2012, "without ever notifying anyone at the division, mainly the shop manager . . ., that the temperature gauge was reading between 220/230 degrees." Johnson Disciplinary Reports. Prior to that termination notice, Johnson had been issued a written warning regarding the

14

incident, which stated that Johnson had driven the truck all day knowing that it was running too hot, which "may have damaged the engine," and that he "made no attempt" to contact the mechanic about the overheating. Id.

Johnson does not dispute the basic facts regarding the events leading to his termination. Indeed, he acknowledged in his deposition that his truck's temperature gauge was frequently climbing into the "red zone" on the day in question, that running a truck too hot can cause substantial damage, and that when a truck runs too hot the driver should shut the truck down and call the mechanic. Johnson Dep. 174:21-175:20, 187:4-14, 192:7-20. He also admitted in a letter he sent to Defendant after his termination that "the truck was running 220 degrees . . . all day." Def. Mot. Summ. J., Ex. 20, Johnson Correspondence, ECF No. 49-11. His only disagreement with Defendant's account of his termination is that he maintains that the truck ran too hot because of a bad water pump that the mechanics already knew about. See id.

G. Gay Suspension

Plaintiff Gay's employment with Defendant has not been terminated, and he has continuously worked at Souderton since February 2011. Def. Statement Undisputed Facts ¶¶ 90-91. He did incur at least one unpaid suspension, however. On September 19, 2011, he was suspended for three days for pouring the contents

of a red gasoline can into a diesel tank. Def. Mot. Summ. J.,
Ex. 28, Gay Disciplinary Reports, ECF No. 49-13. Gay objected to
that suspension, sending several faxes to Defendant's human
resources manager complaining of racial discrimination and
harassment. Def. Statement Undisputed Facts ¶¶ 114-117. The
human resources manager conducted an investigation of the
incident, discussed the situation with Gay and with Macelak, and
concluded that the disciplinary action was appropriate. Id. ¶¶
118-120. In his deposition testimony, Gay did not dispute that
he engaged in the conduct described, but he maintained that the
incident was not sufficiently serious to warrant a suspension.
Gay Dep. 123:4-24.[9]

## II.  PROCEDURAL HISTORY

After filing a charge with the Equal Employment
Opportunity Commission and receiving a right to sue letter,
Plaintiffs each filed suit against Defendant, bringing
allegations of disparate treatment, hostile work environment,
unlawful termination, and retaliatory discharge, under Title
VII, 42 U.S.C. § 1981, the United States Constitution, and the
Pennsylvania Constitution, as well as state law claims of

---

[9]      Plaintiffs also assert that Gay experienced an
"indefinite suspension" on two occasions, but the Court could
locate no evidence of those suspensions in the record. Pl.
Statement Undisputed Facts ¶ 25.

intentional infliction of emotional distress. Compl. ¶ 1. On February 20, 2013, the Court consolidated the three actions for pre-trial purposes. After discovery, the parties filed cross motions for summary judgment on October 15, 2013, with Plaintiffs filing one joint motion on behalf of all three individual plaintiffs. The parties filed their respective responses, and Defendant has moved to strike Plaintiffs' response due to untimeliness and failure to comply with Federal Rule of Civil Procedure 56 and 28 U.S.C. § 1746. Both motions for summary judgment and Defendant's motion to strike are now ripe for resolution.

## III. LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). A fact is "material" if proof of its existence or nonexistence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248.

The Court will view the facts in the light most favorable to the nonmoving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." <u>Pignataro v. Port Auth.</u>, 593 F.3d 265, 268 (3d Cir. 2010). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the nonmoving party who must "set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 250.

The guidelines governing summary judgment are identical when addressing cross-motions for summary judgment. <u>See Lawrence v. City of Phila.</u>, 527 F.3d 299, 310 (3d Cir. 2008). When confronted with cross-motions for summary judgment "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." <u>Schlegel v. Life Ins. Co. of N. Am.</u>, 269 F. Supp. 2d 612, 615 n.1 (E.D. Pa. 2003) (quoting 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720 (1998)).

**IV.   DISCUSSION**

A. <u>Defendant's Motion to Strike</u>

Before considering Defendant's motion for summary judgment, the Court must decide whether Plaintiffs' response to that motion should be struck, in whole or in part. In its motion to strike, Defendant objects to Plaintiffs' response for three reasons. First, Defendant says that the response is untimely under the operative scheduling order. Second, Defendant contends that the Court cannot rely upon six "declarations" attached to the response because they are unsigned and unsubscribed to. Third, Defendant notes that Plaintiffs' response to Defendant's Statement of Undisputed Facts purports to raise 121 disputes of fact, but cites to the record only twice, both times to the "Deposition of Plaintiff, Benjamin Gay," a 176-page document.

With regard to the timeliness issue, Defendant refers to Plaintiffs' uncontested motion to extend the procedural schedule, which asked the Court to extend the dates in the Amended First Scheduling Order by sixty days. Magistrate Judge Rueter granted the motion, and, as such, all of the dates should have been extended by sixty days, which meant that responses to motions for summary judgment should have been due on October 15, 2013. Based upon that deadline, Plaintiffs' response was

untimely, as it was filed on November 1, 2013. Confusingly, however, the Second Scheduling Order that subsequently issued (which had been submitted by Plaintiffs as a proposed order attached to their motion) set the response deadline for November 1, 2013. It is unclear from the record why that deadline was inconsistent with the sixty-day extension, but, because November 1 is clearly the deadline listed in the operative scheduling order, the Court will accept Plaintiffs' response as timely.

As for Plaintiffs' six "declarations," the law is clear that the Court cannot consider them for purposes of resolving a summary judgment motion. Federal Rule of Civil Procedure 56(c)(4) provides that:

> An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

The advisory notes to Rule 56(c) explain that "[a] formal affidavit is no longer required," because 28 U.S.C. § 1746 now permits unsworn written statements that are "subscribed in proper form as true under penalty of perjury." To be properly subscribed to, a declaration must include the following statement: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct," followed by a date and a signature. 28 U.S.C. § 1746(2). Based

on those rules, the Third Circuit has upheld district court decisions to disregard statements that are unsworn and unsubscribed to. Woloszyn v. Cnty. of Lawrence, 396 F.3d 314, 323 (3d Cir. 2005); see also Pension Benefit Guar. Corp. v. Heppenstall Co., 633 F.2d 293, 300 (3d Cir. 1980) ("Since this affidavit was unsigned it was not in evidence and could not provide any basis for denying the summary judgment motions.").

Here, the six "declarations" attached to Plaintiffs' response as "Appendix Vol. 1" are unsworn, unsigned, and do not include language resembling that required by § 1746. See Plaintiff Declarations, ECF No. 53-2. Indeed, the declarations do not even include a statement that their contents are based upon the personal knowledge of the declarant, as is expressly required by Rule 56(c)(4). Accordingly, the declarations cannot raise a genuine issue of material fact, and the Court will disregard them. See Woloszyn, 396 F.3d at 323.

Finally, Defendant asks that, due to Plaintiffs' failure to support their asserted disputes of fact with citations to specific parts of the record, the Court accept Defendant's statement of facts as undisputed. The Federal Rules of Civil Procedure permit that approach. Rule 56(c)(1) provides that:

> A party asserting that a fact cannot be or
> is genuinely disputed must support the
> assertion by: . . . citing to particular
> parts of materials in the record, including
> depositions, documents, electronically

> stored      information,      affidavits     or
> declarations,  stipulations  (including  those
> made  for  purposes  of  the  motion  only),
> admissions,  interrogatory  answers,  or  other
> materials.

Fed. R. Civ. P. 56(c)(1)(A) (emphasis added). If a party fails to properly support an assertion of fact, Rule 56(e) gives the court the following options: (1) give the party "an opportunity to properly support or address the fact," (2) "consider the fact undisputed for purposes of the motion," (3) grant summary judgment if the facts considered undisputed show the movant is entitled to it, or (4) "issue any other appropriate order." Furthermore, it is well established that the Federal Rules do not allow a party resisting a motion to rely merely upon "bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." McCabe v. Ernst & Young, LLP, 494 F.3d 418, 436-37 (3d Cir. 2007) (quoting Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005)) (internal quotation marks omitted).

It is true that Plaintiffs' numerous submissions to the Court contain minimal citations to the record, and that Plaintiffs' response to Defendant's Statement of Undisputed Facts is particularly lacking. Nonetheless, in an effort to do Plaintiffs every justice, the Court has undertaken an independent review of the record to confirm the facts presented by Defendant and to attempt to discern Plaintiffs' bases for

disputing those facts. When the Court has been unable to locate
a factual basis in the record for Plaintiffs' dispute, however,
it has disregarded Plaintiffs' conclusory allegations that a
fact is disputed and has instead treated the fact as
uncontested.

For all of those reasons, the Court accepts Plaintiffs'
response to Defendant's motion as timely, but it will disregard
the six unsigned declarations attached to the response and treat
as undisputed Defendant's statement of facts to the extent that
the record does not appear to support Plaintiffs' asserted
"genuine disputes."

B. Defendant's Motion for Summary Judgment

Defendant's basic argument in support of its motion for
summary judgment is that there is no evidence upon which a
reasonable trier of fact could find in Plaintiffs' favor.
According to Defendant, the evidence conclusively reveals that
Plaintiffs Davis and Johnson were fired for legitimate,
nondiscriminatory reasons; that Plaintiff Gay's employment has
never been terminated; that Defendant does not discriminate in
its assignment of trucks to drivers, or in any of its other
policies and programs; and that Macelak's profane language did
not create a hostile work environment for Defendant's black
employees. Put simply, Defendant contends that Plaintiffs have
offered only bare assertions and conclusory allegations in

support of their claims, which cannot satisfy their burden of proof and therefore entitle Defendant to judgment as a matter of law.

Plaintiffs' primary contention is that Defendant's treatment of Plaintiffs constitutes race-based employment discrimination, in violation of Title VII.[10] Title VII makes it an unlawful employment practice for an employer

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . .

42 U.S.C. § 2000e-2(a)(1). An employer can violate Title VII "by either explicit or constructive alterations in the terms or conditions of employment." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 752 (1998). When an employer makes an explicit, tangible change to the terms or conditions of a person's employment on the basis of a protected characteristic, that person has a straightforward employment discrimination claim under Title VII. But the Supreme Court has made clear that Title VII's language "is not limited to 'economic' or 'tangible'

---

[10]     Plaintiffs also bring claims under 42 U.S.C. § 1981, which, under these circumstances, are analyzed identically to their Title VII claims. Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 267 (3d Cir. 2010). To the extent that Plaintiffs are also bringing constitutional and state law claims, those claims are addressed infra, see Section IV.B.c.

discrimination." <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993) (quoting <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 64 (1986)). Rather, Title VII also protects employees from a "discriminatorily hostile or abusive environment," which, if sufficiently "severe or pervasive," is considered to amount to a material change in the conditions of employment. <u>Id.</u>; <u>see also</u> <u>Burlington Indus.</u>, 524 U.S. at 752.

Plaintiffs' Title VII claims implicate both forms of workplace discrimination. First, Plaintiffs identify as "tangible employment actions" the terminations of Plaintiffs Johnson and Davis and the suspension of Plaintiff Gay.[11] They contend that those adverse actions were motivated by race-based animus, in violation of Title VII. Second, Plaintiffs contend that they received disparate treatment in a variety of aspects of their jobs, including the assignment of trucks, disciplinary reports, and burdensome work tasks. They also say that they and other black drivers were generally the targets of Macelak's abusive language. Cumulatively, that disparate treatment amounts

---

[11]     Although Plaintiffs assert that Gay was constructively discharged, <u>see</u> Pl. Br. Supp. Resp. 2, ECF No. 53-1, they have not explained how the facts here constitute a constructive discharge. <u>See</u> <u>Cardenas v. Massey</u>, 269 F.3d 251, 263 (3d Cir. 2001) ("In order to establish a constructive discharge, a plaintiff must show that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.").

to a hostile work environment, Plaintiffs contend. The Court addresses each of those two theories of liability in turn.

a. Tangible Adverse Employment Actions

To establish a prima facie case of employment discrimination under Title VII, a plaintiff must show that (1) he is a member of a protected class; (2) he is qualified for the position; (3) he suffered an adverse employment action; and (4) the circumstances give rise to an inference of unlawful discrimination. Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008). If the plaintiff succeeds in making out a prima facie case, then, under the familiar McDonnell Douglas framework, "the burden of production shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for the action." Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 271 (3d Cir. 2010) (internal quotation marks omitted); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[12] If the defendant

---

[12]     Although Plaintiffs at times seem to acknowledge that the McDonnell Douglas standard applies to their claims, at one point in their response to Defendant's motion they suggest that the burden-shifting framework does not apply because "the record shows direct evidence of discrimination relative to all counts in their complaints." Pl. Resp. ¶ 14. Plaintiffs do not point to any such evidence, however, instead citing generally to Macelak's deposition testimony. Nor could they, as there is no evidence in the record that qualifies as "direct" evidence of discrimination. Direct evidence of discrimination is evidence that "reveal[s] a sufficient discriminatory animus" to render any shift in the burden of production "unnecessary." Anderson v. Consol. Rail Corp., 297 F.3d 242, 248 (3d Cir. 2002). In other words, the evidence has to "'lead[] not only to a ready

states such a reason, the presumption of discrimination raised by the prima facie case is rebutted, and plaintiff must show by a preponderance of the evidence that the defendant's explanation is actually a pretext for discrimination. Id.; see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-08 (1993) (explaining that, if a defendant produces a nondiscriminatory reason for its action, plaintiff has an opportunity to show "that the proffered reason was not the true reason for the employment decision and that race was") (citation and internal quotation marks omitted). Throughout this burden-shifting process, "the ultimate burden of proving intentional discrimination always rests with the plaintiff." Anderson, 621 F.3d at 271.

    In order to establish that an employer's proffered justification is merely a pretext for discrimination, a plaintiff must provide evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or

_____

logical inference of bias, but also to a rational presumption that the person expressing bias acted on it' when he made the challenged employment decision." Fakete v. Aetna, Inc., 308 F.3d 335, 339 (3d Cir. 2002) (quoting Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1097 (3d Cir. 1995)). Plaintiffs' conclusory assertions that Macelak acted based upon racial bias are insufficient to satisfy that "high hurdle." See Anderson, 297 F.3d at 248.

determinative cause of the employer's action." Burton v.
Teleflex Inc., 707 F.3d 417, 427 (3d Cir. 2013) (quoting Fuentes
v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)). To meet that
burden, a plaintiff "cannot simply show that the employer's
decision was wrong or mistaken." Fuentes, 32 F.3d at 765; see
also Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 332 (3d
Cir. 1995) ("[A]n employer may have any reason or no reason for
discharging an employee so long as it is not a discriminatory
reason."). Evidence undermining an employer's proffered reason
therefore must be sufficient to "support an inference that the
employer did not act for its stated reasons." Sempier v. Johnson
& Higgins, 45 F.3d 724, 731 (3d Cir. 1995). A plaintiff can
satisfy that burden at the summary judgment stage by
"demonstrat[ing] such weaknesses, implausibilities,
inconsistencies, incoherencies, or contradictions" in the
employer's explanation for its action "that a reasonable
factfinder could rationally find them 'unworthy of credence.'"
Burton, 707 F.3d at 427 (quoting Fuentes, 32 F.3d at 765).

As discussed above, Plaintiffs identify three actions
that would qualify as "adverse employment actions" for purposes
of a Title VII employment discrimination claim – Davis's
termination, Johnson's termination, and Gay's suspension. See
Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001) (defining
an "adverse employment action" as an action by an employer that

is "serious and tangible enough to alter" the terms or
conditions of plaintiff's employment). Defendant has offered a
legitimate, nondiscriminatory reason for each of those actions.
With regard to the termination of Davis's employment, Defendant
has introduced evidence that Davis was fired for excessive
tardiness and unexcused absences. As for Johnson, Defendant says
his employment was terminated because of an incident in which he
knowingly operated a truck that was overheating for eight hours
without calling a mechanic, which Defendant deemed to be
intentional abuse of company property. Finally, Defendant says
that Gay was suspended for three days without pay because he
improperly poured the contents of a red gasoline can into a
diesel tank. Therefore, assuming for the sake of argument that
Plaintiffs have established the other elements of their prima
facie cases, in order to survive summary judgment Plaintiffs
must provide evidence showing that those proffered
justifications are a mere pretext for race-based discrimination.

    Plaintiffs have not done so. None of the individual
plaintiffs actually challenge the substance of the reasons
proffered for the adverse employment actions. Indeed, Davis
acknowledged his habitual tardiness, Johnson admitted the truck
he was driving was overheating all day and that he failed to
call a mechanic despite knowing the harm that could result, and
Gay did not dispute that he wrongly poured the contents of a red

gasoline can into a diesel tank. At best, Plaintiffs suggest that their conduct did not warrant the consequences imposed – in other words, they contend that "the employer's decision was wrong or mistaken," which is inadequate to establish pretext. See Fuentes, 32 F.3d at 765. Furthermore, although they assert that race was at least a motivating factor in Defendant's employment decision, there is simply no evidence beyond that conclusory assertion connecting the challenged actions to "an invidious discriminatory" motive. See Burton, 707 F.3d at 427. Plaintiffs' challenges to their terminations and suspension therefore fail as a matter of law, as there is no evidence upon which a reasonable jury could find in their favor.[13]

####    b. Hostile Work Environment

As explained above, a plaintiff can also succeed on a Title VII employment discrimination claim by showing that he was subjected to a "discriminatorily hostile or abusive" work environment. Harris, 510 U.S. at 17. To establish a hostile work environment claim, a plaintiff must show that (1) he suffered

---

[13]    To the extent that Plaintiffs also challenge the terms of their compensation, they have not established a prima facie case of discrimination in that regard, as they have not produced any actual evidence that they were compensated differently than similarly situated employees. See Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410-11 (3d Cir. 1999) (explaining that a common method by which a plaintiff can raise an inference of discrimination is by demonstrating that he was treated less favorably than a similarly situated employee outside of the protected class).

intentional discrimination because of a protected
characteristic; (2) the discrimination was severe or pervasive;
(3) it detrimentally affected him; (4) it would have
detrimentally affected a reasonable person of the same protected
class in his position; and (5) there is a basis for vicarious
liability. Mandel v. M & Q Packaging Corp., 706 F.3d 157, 167
(3d Cir. 2013).

When deciding whether those elements are established,
courts must evaluate the record "as a whole," concentrating "not
on individual incidents, but on the overall scenario." Cardenas,
269 F.3d at 261 (quoting Durham Life Ins. Co. v. Evans, 166 F.3d
139, 149 (3d Cir. 1999)). Relevant circumstances may include
"the frequency of the discriminatory conduct; its severity;
whether it is physically threatening or humiliating, or a mere
offensive utterance; and whether it unreasonably interferes with
an employee's work performance." Mandel, 706 F.3d at 168
(quoting Harris, 510 U.S. at 23). Unless extremely serious,
offhand comments and isolated incidents are insufficient to
sustain a hostile work environment claim. Caver v. City of
Trenton, 420 F.3d 243, 262 (3d Cir. 2005).

In considering the circumstances as whole, courts must
also keep in mind that the relevant question is not whether a
plaintiff was subjected to an abusive or unpleasant work
environment generally – it is whether the plaintiff's workplace

31

was "discriminatorily hostile or abusive." Harris, 510 U.S. at
17 (emphasis added). A plaintiff does not establish a hostile
work environment under Title VII merely by showing that he had a
demanding and profanity-prone manager, that he was required to
drive uncomfortable or dangerous vehicles, or that he was
sometimes unfairly asked to perform work above and beyond his
general job description. For a work environment to be considered
"hostile" in a Title VII sense, circumstances like those must be
shown to constitute discrimination on the basis of a protected
characteristic. See Lebofsky v. City of Phila., No. 06-5106,
2009 WL 1507581, at *10 & n.21 (E.D. Pa. May 29, 2009) ("It is
not enough to show unpleasant consequences in the workplace.
They must flow from an act of discrimination."). And for a
plaintiff to survive a motion for summary judgment on a hostile
work environment claim, there must be actual evidence of that
discrimination.

     In this case, Plaintiffs base their hostile work
environment claims on the following assertions of discriminatory
conduct: (1) black drivers were assigned to drive dangerous
trucks more frequently than white drivers; (2) black drivers
were more often called upon to assist white drivers with their
routes than the other way around; (3) black drivers were
subjected to excessive discipline and more burdensome work
assignments; and (4) Macelak directed his profane and derogatory

language disproportionately toward black drivers. The Court therefore confronts two interrelated questions, which it will discuss in turn: first, whether there is any record evidence supporting those assertions, and, second, whether that evidence is sufficient to enable each plaintiff to establish a hostile work environment claim.

### 1. Evidence of Discrimination

With regard to the allegedly dangerous trucks, there is little evidence that those trucks were assigned to drivers in a discriminatory fashion. Defendant introduced truck usage logs showing which drivers used each of the trucks during 2011 and much of 2012. Those logs show that both black and white drivers were assigned to trucks of varying quality. Some black drivers drove new model trucks, and some white drivers were assigned to the older, allegedly less safe vehicles. All drivers were allowed (and expected) to refuse to operate a truck they deemed unsafe, and drivers of both races did so on occasion without facing punishment.[14] The only evidence that race played a role in truck assignment is Plaintiff Gay's testimony that he did not see white drivers operating the four allegedly dangerous trucks

---

[14]     Plaintiff Gay said that he felt like he got dirty looks when he refused to operate a vehicle, and Plaintiff Johnson found it difficult to refuse for financial reasons when there was not another vehicle available, but both of them agreed that they were never disciplined for refusing to operate a truck they deemed dangerous.

(which is undermined by his admission that he generally left on his route before other drivers and finished before they returned), and log data showing that black drivers were assigned trucks FE-99 and FE-116 slightly more often than white drivers.

As for the allegations that black drivers were subject to more frequent assistance requests, excessive discipline, and more burdensome work assignments, there is no record evidence of race-based discrimination in that regard. Although Plaintiff Gay speculates that black drivers experienced those conditions more often than white drivers, he has no personal knowledge upon which to base that assertion. Moreover, Defendant has introduced disciplinary records rebutting Gay's speculation and showing that white employees were disciplined for the same offenses as black employees. Defendant also points to testimony from Souderton's dispatcher that both black and white drivers were occasionally called upon to help with other drivers' routes. There is simply no evidence, beyond Plaintiffs' bare assertions, that the work assignments and discipline Plaintiffs experienced were discriminatory, rather than just burdensome, undeserved, or unpleasant.

Finally, Plaintiffs have presented substantial evidence that Macelak was sometimes verbally abusive to his employees, but less evidence that his abuse had a race-based bias. Indeed, Plaintiffs concede that the abuse directed toward them was

34

shared by employees of all races. Pl. Mem. Supp. Mot. Summ. J.
4. The only evidence supporting the assertion that Macelak's
conduct was in any way discriminatory is (1) Gay's testimony
that Macelak sometimes seemed to be looking at the black drivers
in particular during his profanity-laced tirades at monthly
"safety" meetings; (2) Gay's more general claim that he did not
see Macelak abuse white employees; (3) Gay's account of
overhearing a person who sounded like Macelak use a racial slur
to describe President Obama; and (4) Macelak's use of the phrase
"you know they talk" in a memo, which could be interpreted to
refer to the black drivers.

　　　　In sum, viewed in the light most favorable to Plaintiffs,
there is some evidence suggesting that black employees were
assigned dangerous trucks on a slightly more frequent basis than
white employees. There is also evidence that Macelak sometimes
focused on the black employees when using profane (but not
overtly racial) language, that Macelak was once overheard using
a racial slur, and that Macelak used the word "they" to possibly
refer to black drivers as a group in a negative manner.

　　　　　　　　　　2. Establishing a Hostile Work Environment Claim

　　　　　　The next question for the Court is whether, based upon
that evidence, each individual plaintiff can establish the
elements of a hostile work environment claim. As discussed
above, those elements are: (1) plaintiff suffered intentional

35

discrimination because of a protected characteristic; (2) the discrimination was severe or pervasive; (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person of the same protected class in his position; and (5) there is a basis for vicarious liability. Mandel, 706 F.3d at 167. Each plaintiff must therefore be able to show that the disproportionate assignment of dangerous trucks and Macelak's discriminatory use of abusive language constitute "severe or pervasive" discrimination that negatively affected him and would have negatively affected a reasonable person in his situation.

Plaintiffs have not made such a showing. With regard to Plaintiffs Gay and Davis, they rarely used any of the four trucks purported to be dangerous. The handful of times that they were asked (and did not refuse) to drive the allegedly unsafe vehicles is insufficient to rise to the level of "severe or pervasive" conduct, and Plaintiffs do not explain how those occasional instances "detrimentally affected" them. As for Macelak's comments and derogatory language, the only two comments Plaintiffs identify that were racial in nature are the overheard remark about President Obama and the phrase "you know they talk" in an internal memorandum. Such offhand comments cannot form the basis of a hostile work environment claim, especially when, as here, they were not actually directed at the

employees in question. See Caver, 420 F.3d at 262. Macelak's other, more generic remarks and profane comments occurred more frequently, but, as discussed above, the relevant question is the extent to which Macelak's verbal abuse was exercised in a discriminatory fashion. The profanity-laden tirades that Plaintiffs say seemed targeted at the black employees occurred monthly, at most,[15] and they were only indirectly – not explicitly – targeted at the black drivers. Such periodic and indirect offensive conduct is simply not so "severe or pervasive" to amount to a material change in the conditions of employment, and therefore cannot form the basis for a hostile work environment claim. See Harris, 510 U.S. at 21.

As for Plaintiff Johnson, he was subject to the same occasional rough language by Macelak as Gay and Davis, but, unlike the other two plaintiffs, he was also regularly assigned to drive one of the allegedly dangerous trucks. The evidence shows that, from June 2011 through March 2012, FE-116 was Johnson's primary vehicle. But the evidence also shows that, before Johnson began driving that truck on an almost daily basis, a white driver (Tim Presanto) was generally assigned to drive FE-116. There is no evidence that the switch from Presanto

---

[15]     Plaintiff Gay is the only plaintiff who testified regarding the frequency of the targeted tirades, and he said they occurred at least three or four times.

to Johnson was itself an act of race-based discrimination. Therefore, although Johnson may have preferred to drive a different truck, the fact that he was assigned to FE-116 on a regular basis is not evidence that he was routinely exposed to a <u>discriminatorily</u> hostile or abusive environment. Accordingly, like Plaintiffs Gay and Davis, Johnson has not identified any discriminatory conduct that is sufficiently "severe or pervasive" to establish a hostile work environment claim.

In so concluding, the Court expresses no opinion as to whether the condition of Defendant's trucks was acceptable, whether Plaintiffs' overall work environment was safe and supportive, or whether Macelak's conduct was appropriate. Neither Title VII nor § 1981 create a federal forum in which to adjudicate every grievance connected to the workplace. The only question before the Court is whether a reasonable jury could find that Defendant's treatment of Plaintiffs amounted to a discriminatorily hostile work environment. The evidence Plaintiffs have provided is insufficient to establish the elements of that claim. Accordingly, Defendant is entitled to judgment as a matter of law on all of Plaintiffs' Title VII claims.

c. <u>Other Claims</u>

In addition to their claims under Title VII and § 1981, Plaintiffs allege violations of the United States and

38

Pennsylvania constitutions. They do not explain how their
constitutional rights have been violated, however, nor do they
establish any legal basis for recovery. Accordingly, those
claims fail as a matter of law.

Plaintiffs also bring state law tort claims for
intentional infliction of emotional distress. To succeed on such
a claim, a plaintiff "must prove that the defendant, by extreme
and outrageous conduct, intentionally or recklessly caused the
plaintiff severe emotional distress." Motheral v. Burkhart, 583
A.2d 1180, 1188 (Pa. Super. Ct. 1990). Plaintiffs have presented
no evidence that they suffered severe emotional distress, and no
reasonable jury could find that Defendant's alleged conduct is
"so outrageous in character and so extreme in degree, as to go
beyond all possible bounds of decency, and to be regarded as
atrocious, and utterly intolerable in a civilized community."
Rinehimer v. Luzerne Cnty. Comm. Coll., 539 A.2d 1298, 1305 (Pa.
Super. Ct. 1988). Those claims therefore also fail as a matter
of law.

Finally, Plaintiffs occasionally suggest that they are
victims of "retaliation," and that they experienced
discrimination on the basis of national origin. See, e.g., Pl.
Br. Support Resp. 2-3, ECF No. 53-1. They do not provide facts
to support either contention, however, and so, to the extent

39

that they seek to bring claims to that effect, no reasonable jury could find in their favor.

C. Plaintiffs' Motion for Summary Judgment

Because Plaintiffs have not presented evidence upon which a reasonable factfinder could find in their favor on any of their claims, the Court concludes that they are not entitled to judgment as a matter of law, and will deny their joint motion for summary judgment.

## V.   CONCLUSION

For the foregoing reasons, the Court will grant Defendant's motion to strike in part, grant Defendant's motion for summary judgment in its entirety, deny Plaintiffs' joint motion for summary judgment, and enter judgment in favor of Defendant and against Plaintiffs. An appropriate order follows.